**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NICHOLAS ALAN LOBATO,

       Plaintiff,

    v.

MICHAEL J. ASTRUE, Commissioner of
Social Security Administration

       Defendant.

_____/

No. C-10-02022 JCS

**ORDER GRANTING PLAINTIFF'S
SUMMARY JUDGMENT MOTION AND
DENYING DEFENDANT'S SUMMARY
JUDGMENT MOTION**

**[Docket Nos. 11, 15]**

## I.    INTRODUCTION

    Plaintiff, Nicholas Alan Lobato ("Plaintiff"), seeks judicial review of the final decision of the
Commissioner of the Social Security Administration ("Defendant") denying his Application for
disability insurance and Supplemental Security Income ("SSI") benefits under of the Social Security
Act ("SSA").  Plaintiff asks the Court to reverse the Defendant's denial of  benefits and remand with
instructions to award benefits or, in the alternative, to remand for additional administrative
proceedings.  For the reasons stated below, the Court GRANTS Plaintiff's Motion for Summary
Judgment, DENIES Defendant's Motion for Summary Judgment and remands for award of benefits.[1]

## II.    BACKGROUND

###     A.    Procedural Background

    Plaintiff filed a claim for disability benefits on August 2, 2005, alleging disability as of that
date due to low back pain.  Administrative Record ("AR") at 8.  That claim was denied initially on

---

[1]The parties have consented to the jurisdiction of a United States magistrate judge pursuant to 28 U.S.C.
§ 636(c).

1   September 14, 2007, and on reconsideration on January 11, 2008. *Id.* Plaintiff filed a timely written

2   request for a hearing on February 8, 2008. *Id.*

3       The hearing was held on June 4, 2009. *Id.* Plaintiff was represented at the hearing by

4   Richard Gutstadt, an attorney. *Id.* Plaintiff, Plaintiff's girlfriend Dawn Rouanzoin,[2] and a

5   vocational expert, Jeff Malmuth, all testified at the hearing. *Id.* Administrative Law Judge ("ALJ")

6   Randolph E. Schum presided over the hearing. *Id.* at 17. In a decision dated September 29, 2009,

7   the ALJ denied Plaintiff's claim of disability. *Id.* at 16-17.

8       Plaintiff filed this action pursuant to 42 U.S.C. § 405(g), which gives the Court jurisdiction

9   to review the final decision of the Commissioner. Plaintiff has filed a motion for summary judgment

10  asking the Court to reverse the decision of the Commissioner, and either to remand for benefits or

11  for further administrative proceedings. Plaintiff's Motion for Summary Judgment ("Plaintiff's

12  Motion") 19-20. The Defendant has responded with a Cross-Motion for summary judgment, asking

13  the Court to uphold the Commissioner's final decision. Defendant's Notice, Motion, and

14  Memorandum in Support of Cross-Motion for Summary Judgment and In Opposition to Plaintiff's

15  Motion for Summary Judgment ("Defendant's Cross-Motion") at 23.

16      **B**.   **Plaintiff's Background**

17      Plaintiff was born on May 27, 1966 and was 39 years old on his alleged onset date. AR at

18  16. The Plaintiff has his GED, and attended high school through the eleventh grade. *Id.* at 34.

19  Plaintiff testified that prior to his alleged onset date, he held a series of jobs that included carpet

20  cleaner, UPS driver, heating and cooling technician, and truck loader for Crescent Truck Lines. *Id.*

21  at 35-37.

22      **C.**   **Plaintiff's Medical History**

23      On August 8, 2005, Plaintiff saw his primary physician, Dr. Brenda Malone, who diagnosed

24  low back strain and advised physical therapy and limitations on physical activity at work. *Id.* at 510.

25  

26  [2]The last name of this third party is spelled in Plaintiff's Motion for Summary Judgment as
    "Rouanzion"; throughout the Administrative Record, two spellings appear: "Rovanzion"or

27  "Rouanzoin." In her testimony at the hearing, this witness spells her last name for the court as
    "Rouanzoin." AR at 46. The Court, therefore, uses "Rouanzoin" in this Order.

28

United States District Court
For the Northern District of California

On August 11, 2005, Physical Therapist Dennis Halliday saw Plaintiff on referral from Dr. Malone, wherein Plaintiff complained of low back tightness beginning on or about July 26, 2005, culminating in sharp pain on August 2, 2005. AR at 396. The report stated that Plaintiff was on "light duty at work," and that his pain was aggravated by "prolonged sitting, rising from sitting, and lifting his left leg." *Id.* Records from Sportfit Therapy show that Plaintiff attended physical therapy through October, 2005. *Id.* at 392. The final report from Sportfit, compiled by Lisa Poulsen and Dennis Halliday and dated October 10, 2005, notes that "[c]learly treatment is helping. I'd like to continue treatment with the goal of improving his pain so he can return to work." *Id.*

Plaintiff was also assessed by orthopedic surgeon, Dr. Joseph M. Grant, on November 16, 2005. *Id.* at 525. Dr. Grant assessed an MRI of Plaintiff's lower back, noting that it:

> demonstrat[ed] a central disk herniation, L5-S1, with extrusion, without compression of the thecal sac or lateralization. There is mild facet arthrosis causing some mild neural foraminal compromise. He has a minimal disk protrusion at L4-5, with facet arthrosis. Plain x-rays demonstrate degenerative narrowing at L5-S1, no obvious spondylolysis or spondylolisthesis.

*Id.* at 526. Dr. Grant further noted that a "simple diskectomy would most likely not result in significant relief of his symptoms, particularly in light of the fact that his disk does not lateralise to the left, which is the side of most of his radicular complaints. I have therefore recommended against surgery at this time." *Id.* Dr. Grant further recommended epidural injections for the low back pain. *Id.* Plaintiff received two epidural injections on December 21, 2005. *Id.* at 520.

Dr. Grant's reevaluation on January 25, 2006 noted that the Plaintiff had no relief from the epidural injections and that "it is unlikely any further nonoperative treatment would give [Plaintiff] much relief." *Id.* at 524. In a letter dated February 15, 2006, Dr. Grant also advised Plaintiff to transfer his care to another physician. *Id.* at 522.

Treatment records from Pleasanton Urgent Care Medical Clinic, from March 15, 2006 through June 9, 2008, indicate that various treatments were attempted, but Plaintiff continued to experience lower back pain. *Id.* at 400-502. On June 5, 2006, Plaintiff was referred to Dr. Richard Nolan, a spine specialist, who from that point on served as his treating physician. *Id.* at 497, 512. Following this referral, Plaintiff received another MRI on June 28, 2006. This MRI found:

United States District Court

For the Northern District of California

- • A 10% compression fracture deformity of the T12 with mild edema subjacent to the superior endplate
- • Moderate degenerative disc disease, L5-S1.
- • Mild grade I retrolisthesis of L5 on S1.
- • Small posterior osteophyte formation.
- • Diffuse broad-based disc bulge.
- • L5 and S1, mild right and left neural foraminal stenosis.

*Id.* at 538.  Plaintiff also received an EMG of his back on July 12, 2006.  *Id.*  The EMG physician, Dr. Marina Bulatov, summarized the findings in an EMG/NCV report: "Impression: ELECTRODIAGNOSTIC EVIDENCE FOR CHRONIC S-1 RADICULOPATHY ON THE LEFT. NO EVIDENCE FOR LUMBAR PLEXOPATHY OR PERIPHERAL NEUROPATHY."  *Id.* at 514.

Plaintiff also saw Dr. Jacob Rosenberg, on referral from Dr. Nolan, regarding other epidural injections and methods of pain management and treatment.  Dr. Rosenberg performed epidural injections on September 29, 2006 and March 16, 2007.  *Id.* at 337-340.  On September 9, 2006, Dr. Rosenberg reported that Plaintiff may suffer from piriformis syndrome, and that they would pursue treatment of that if the S1 transforaminal injections they were currently pursuing did not provide relief.  *Id.* at 339.  He also noted "pain with abduction against persistence in a sitting position."  *Id.* Dr. Rosenberg noted in his report on the March 16 injection that the July 29 injection offered no significant relief or worsening of Plaintiff's condition, and that the "etiology of [Plaintiff's] pain remains a mystery."  *Id.* at 338.

Plaintiff was also examined by Dr. Nicole Chitnis, M.D., who served as the Agreed Medical Examiner for Plaintiff's California Worker's Compensation claim.  *See* AR at 350-74.  She assessed Plaintiff on January 23, 2007.  *Id.* at 366.  In a report dated March 9, 2007, Dr. Chitnis' impression was of:

1. Lumbar radiculopathy
2. Lumbar degenerative disc disease
3. SI joint syndrome
4. Mysofascial pain syndrome.

*Id.* at 371.  Dr. Chitnis further noted that the pain was "multifactorial in nature," and that Plaintiff is "not permanent and stationary at this time."  *Id.* at 372.  She found "no evidence of symptom magnification or psychogenic pain syndrome."  *Id.*  Dr. Chitnis noted that "Mr. Lobato will not be

4

able to return to his job as a UPS driver, and medically, is a Qualified Injured Worker." *Id.* Finally, Dr. Chitnis recommended further conservative treatment, to include "medications, physical therapy focusing on lumbar stabilization and functional restoration. . . .a trial of chiropractic care, as well as acupuncture . . . another epidural steroid injection, SI joint injection, or facet injection can be considered." *Id.* at 373.

Dr. Chitnis re-evaluated Plaintiff on July 10, 2007. *Id.* at 354. In a report dated August 23, 2007, Dr. Chitnis noted that "there is evidence of exaggerated pain behavior" and that there is "no evidence of lumbar radiculopathy," as "radicular symptoms seem to have dissipated." *Id.* at 359. Dr. Chitnis also ordered a pain battery test, which she summarized in the same report, noting that "[i]t suggested that psychological factors were affecting his pain behavior and will interfere with response to traditional medical treatment." *Id.* She found Plaintiff to be "permanent and stationary" as of the date of the re-evaluation, and noted that Plaintiff was still "medically, a Qualified Injured Worker." *Id.* Dr. Chitnis opined "6% whole person impairment," with a disability equivalent "to precluding heavy lifting." *Id.* at 360. Dr. Chitnis recommended evaluation and treatment with a psychiatrist "to focus on functional restoration with six to eight sessions of physical therapy with focus on instructions in self directed home exercise program [sic]." *Id.*

Dr. Chitnis also compiled a supplemental report on Feb 28, 2008. *Id.* at 351. The report focused on a medical request for treatment of Plaintiff's hip. *Id.* at 352. Dr. Chitnis noted that she "cannot imagine why the patient would develop intra-articular hip pathology now, two and a half years post-injury," the Plaintiff's treatment had been appropriate thus far, and that treatment should instead focus on "functional restoration" as noted in her previous evaluation. *Id.* An MRI was ordered of Plaintiff's hip. *Id.* at 539. This MRI was performed on August 14, 2008, and the results were normal. *Id.*

In a Medical Legal Report, issued on May 26, 2009, Plaintiff's treating physician Dr. Nolan advised on Plaintiff's treatment history and condition at that time. *Id.* at 537. In the report, Dr. Nolan states that due to the severity of Plaintiff's ongoing symptoms and physical limitations pertaining to his back pain, he has been unable to return to work or find sedentary work. *Id.* at 540.

**United States District Court**

For the Northern District of California

1    The report further states that Plaintiff "requires surgical intervention with a disability period of

2    approximately 12 months." *Id.* at 541.  Dr. Nolan further notes that following surgery:

3           the limitations would be very similar to the current limitations – that is, no prolonged
            sitting, standing, or walking; no repetitive stooping, bending, lifting, carrying, pushing,

4           pulling, twisting, and turning; no lifting or carrying in excess of 10 pounds; the avoidance
            of cold, damp environments; the ability change positions as necessary to control the

5           symptoms; the ability to take medications (narcotic and muscle relaxant) to control the pain
            during work hours.  An ergonomic workstation would be necessary. . .

6

7    *Id.* at 540-541.  Dr. Nolan further notes that due to Plaintiff's "age, work experience, and education,"

8    he would require four to six months in a vocational rehabilitation program.  *Id.* at 541.

9           Dr. Susan Gutierrez. M.D., a pain management specialist, examined Plaintiff on June 2,

10   2009, on request of Dr. Nolan.  Dr. Gutierrez recommended "trial aquatic therapy" two times a week

11   for six weeks, "as well as some transforaminal epidural steroid injections and a repeat MRI." *Id.* at

12   545.  She further recommended a functional restoration program if "the patient is willing and able,"

13   though she also noted that "at this point the patient's pain is not controlled" she stated that she did

14   not feel that "interventional procedures and treatment ha[d] been exhausted." *Id.*

15          **D.      Noreen A. Lobato-Canals's Function Reports**

16          Noreen A. Lobato-Canals, Plaintiff's sister, completed a Function Report, describing her

17   interactions with Plaintiff and her perceptions of Plaintiff's abilities, on August 8, 2007.  *Id.* at 238.

18   In the report, she states that she visits Plaintiff approximately once per month at Plaintiff's

19   apartment.  *Id.*  She notes that the Plaintiff does "everyday duties," which included driving his sons

20   to school and "cleaning, laundry and cooking." *Id.* at 239.  She also notes that Plaintiff cannot

21   currently "sit, stand or lay for too long (in one place)" and that "[h]e's unable to sleep comfortably

22   in any position." *Id.* at 240-41.  Plaintiff shops for groceries once a week, for an unknown amount of

23   time. *Id.* at 241.  Aside from trips to the grocery stores, Ms. Lobato-Canals noted that the only other

24   place that Plaintiff regularly goes is "the doctors." *Id.* at 242.  Plaintiff's interaction with others was

25   described as "talk[ing], watches T.V.," and Ms. Lobato-Canals further noted that Plaintiff "doesn't

26   attend many social activities." *Id.* at 242-43.  Regarding Plaintiff's abilities, the Report states that

27   "anything involving his back is hard for him to do, it is unknown to me how much he can lift,

28                                                              6

United States District Court

For the Northern District of California

depending on the day or if hes on medication [sic]." *Id.* at 243. She notes that Plaintiff can follow written and spoken instructions "very well," and can handle stress "as well as be expected." *Id.* at 243-44.

### E.     The Administrative Hearing

The ALJ held an administrative hearing on Plaintiff's claims on June 4, 2009. At the hearing, Plaintiff testified that the pain had not arisen from one "episode in particular" while he was employed, but that it came "through the course of doing the job." *Id.* at 38. According to Plaintiff, since the onset of pain, he has experienced "[a] lot of pain" mainly in his lower back at belt level, though "[s]ometimes it shoots down [his] left– to [his] left foot." *Id.* Plaintiff noted that he experiences the pain in his leg approximately five times per week, and that he also has muscle spasms daily. *Id.* at 40. In order to alleviate the pain, Plaintiff testified that he takes medication, rests, and elevates his feet. *Id.* When questioned about current medication, Plaintiff stated that he was taking Norco for pain, Soma for muscle spasms, Lyrica, Lunesta to help the quality of his sleep, and a Lidoderm patch. *Id.* at 42. He further stated that side effects of the medication include sweatiness, irritability, and difficulty concentrating for eight to ten hours on a daily basis, noting that this lack of concentration means that he "wouldn't trust [him]self" to make change. *Id.* at 43.

Plaintiff further testified that he believes he is deteriorating over time, and that he wants "to walk and do stuff less than ever before." *Id.* at 44. He further noted that his ability to function in his daily activities has also decreased, and that he "can't mow the lawn anymore, or cook meals, or do the laundry. . . or lift anything heavy." *Id.* Plaintiff also testified that while his children formerly lived with him, they moved out because Plaintiff "ran out of money and . . . could no longer take care of them," which Plaintiff further stated was due to his back condition. *Id.* at 45.

The ALJ next questioned Dawn Rouanzoin, who lives with Plaintiff. Ms. Rouanzoin testified that she had lived with Plaintiff for three years, and based on her observations over those three years, that he is unable to work a full-time job. *Id.* at 47. Ms. Rouanzoin stated that she observed pain, depression, and inability to focus on a daily basis, and that Plaintiff's condition had deteriorated significantly. *Id.* Ms. Rouanzoin further stated that this deterioration was seen in his

United States District Court

For the Northern District of California

lessened ability to fulfill normal functions, such as "shopping, housework, sleeping, walking, driving, concentrating." *Id.* She attributed Plaintiff's lack of concentration to the medication and pain Plaintiff experiences. *Id.* Ms. Rouanzoin further stated that the amount of time Plaintiff must recline has also increased over the past year, and that Plaintiff is "constantly having to switch positions." *Id.* at 48. The ALJ further questioned Ms. Rouanzoin on her background, wherein she stated that she was not a nurse or a doctor, had no background in "vocational evaluations," and no background in pharmaceuticals. *Id.* at 49. The ALJ further established that Ms. Rouanzoin does any household activities that Plaintiff is unable to do, and that Ms. Rouanzoin also pays for the residence where she and Plaintiff live.

Subsequently, the ALJ questioned the vocational expert ("VE"). The ALJ posed three hypothetical scenarios to the VE, each consisting of different combinations of limitations on a particular worker. First, he asked the VE to assume the following limitations:

> . . . [H]ypothetical claimant at 39 at alleged date of onset with a GED and some limited vocational experience and training. . . . can lift and carry 20 pounds occasionally, 10 pounds frequently. Stand and walk for six hours out of eight, sit for six. . . . occasionally climb stairs and ramps. Never ropes, ladders, and scaffolds. Occasionally stoop. Given those restrictions and those alone, could this hypothetical Claimant return to any past relevant work?

*Id.* at 50. The VE responded that there was no past relevant work that could be performed by an individual with these limitations but that such an individual could work as a ticket taker, D.O.T. code 344.667-010, of which there are approximately 3,100 such positions in California and 23,500 such positions in the national economy. *Id.* at 50-51. The V.E. testified that an individual with these limitations would also be able to work as a "cashier II", D.O.T. code 211.462-010, and that there are approximately 180,000 such positions in California, and 1,700,000 such positions in the national economy. *Id.* at 50.

Next, the ALJ changed the activity limitations to "[s]tand or walk for two hours out of eight, sit for six. . . . Occasionally balance, stoop, kneel, crouch, and crawl," with the other limitations remaining the same. *Id.* at 51. With these limitations, the VE testified that office and administration support work would be proper, for which there are 14 D.O.T. codes. *Id.* One representative code

8

United States District Court

For the Northern District of California

1  was for a "call out operator," D.O.T. code 237.367-014, of which there are 16,000 such positions in

2  California and 77,000 nationwide.  *Id.*  The VE also noted that these limitations allowed

3  employment in "printed circuit layout," a production occupation, D.O.T. code 017.684-010, of

4  which there are 5,500 positions in California and 46,000 positions nationwide.  *Id.* at 52.

5      In his third hypothetical, the ALJ asked the VE to assume the same lifting limitations,

6  alongside "[s]tand or walk for six hours out of eight, sit for six.  Occasionally climb stairs and

7  ramps.  Never ropes, ladders, and scaffolds.  Occasionally balance, stoop, kneel, crouch and crawl.

8  Should avoid concentrated exposure to extreme cold, hazard of unprotected heights, and moving and

9  dangerous machinery." *Id.* at 52.  In response, the V.E. testified that the production occupations

10  listed in the previous hypothetical could no longer be performed, but that the Plaintiff could still

11  work as  an "escort vehicle driver," D.O.T. code 919.663-022, which is a job in the unskilled

12  sedentary subcategory of for transportation and material mover; 3,200 such positions exist in

13  California and 29,000 such positions exist in the United States.  *Id.* at 52-53.

14      The VE also responded to questions posed by Plaintiff's counsel concerning other limitations

15  on work ability.  *Id.* at 53.  When Plaintiff's counsel posed the limitation of needing to move around

16  every 10 to 15 minutes, the VE replied that an individual with that limitation would likely be

17  unemployable.  *Id.*  Plaintiff's counsel then posed the limitation of needing to "take unscheduled

18  work interruptions of one half hour, four to five times per week."  *Id.*  The VE responded that with

19  that limitation, the individual would be unemployable for unskilled work, specifying that unskilled

20  work "requires individuals to maintain productivity up to a standard minimum pace. . . . And taking

21  unscheduled breaks I don't believe would be reasonable for an employer to accept."  *Id.* at 53-54.

22  The next hypothetical involved the limitation of "difficulty concentrating a minimum of two hours

23  per day, such that they're unable to effectively maintain their focus."  *Id.* at 54.  The VE again

24  responded that an individual with that limitation would be unemployable in unskilled work.  *Id.*  The

25  next hypothetical posed concerned the limitation of needing to "lie down or recline two hours per

26  day."  *Id.*  With this limitation, the VE stated that there would be no available jobs aside from those

27  in a "protected or sheltered work environment."  *Id.*  The final hypothetical posed by Plaintiff's

28

1    attorney asked the vocational impact of a limitation where the Plaintiff was "unable to sit forward

2    more than a couple minutes, but while seated needs to lean back against the chair." *Id.*  The VE

3    replied that this would be a significant vocational factor, as unskilled labor may require access to

4    "objects they need to handle and assemble or work with," and that this limitation could impact the

5    "productivity of the operations" without modifications for access. *Id.* at 54-55.  Plaintiff's counsel

6    also inquired whether this limitation would have a similar effect on light production work, wherein

7    the VE responded that it would. *Id.* at 55.

8    **F.      The ALJ's Five-Step Analysis and Findings of Fact Following the
             Administrative Hearing**

9

10    Disability insurance benefits are available under the Social Security Act when an eligible

11    claimant is unable "to engage in any substantial gainful activity by reason of any medically

12    determinable physical or mental impairment . . . which has lasted or can be expected to last for a

13    continuous period of not less than 12 months.  42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C.

14    § 423(a)(1).  A claimant is only found disabled if his physical or mental impairments are of such

15    severity that he is not only unable to do his previous work, but also "cannot, considering his age,

16    education, and work experience, engage in any other kind of substantial gainful work which exists in

17    the national economy."  42 U.S.C. § 423(d)(2)(A).  The claimant bears the burden of proof in

18    establishing a disability. *Gomez v. Chater*, 74 F.3d 967, 970 (9th Cir.), *cert. denied*, 519 U.S. 881

19    (1996).

20    The Commissioner has established a sequential five-part evaluation process to determine

21    whether a claimant is disabled under the Social Security Act.  20 C.F.R. § 404.1520(a).  At Step

22    One, the Commissioner considers whether the claimant is engaged in "substantial gainful activity."

23    20 C.F.R. § 1520(a)(4)(I).  If he is, the Commissioner finds that the claimant is not disabled, and the

24    evaluation ends.  If the claimant is not engaged in substantial gainful activity, the Commissioner

25    proceeds to Step Two.

26    At Step Two, the Commissioner considers whether the claimant has "a severe medically

27    determinable physical or mental impairment," or combination of such impairments, which meets the

28

United States District Court

For the Northern District of California

1   duration requirement in 20 C.F.R. § 404.1509.  20 C.F.R. § 1520(a)(4)(ii).   An impairment is severe

2   if it "significantly limits [the claimant's] physical or mental ability to do basic work activities."  20

3   C.F.R. § 404.1520(c).  In addition, the physical or mental impairment (or combination of

4   impairments) must have lasted, or must be expected to last, for a continuous period of 12 months.

5   20 C.F.R. § 404.1520(a)(4)(ii); 20 C.F.R. § 404.1509.  If the claimant does not have a severe

6   impairment for the required duration, the Commissioner finds the claimant not disabled and the

7   evaluation ends at this step.  C.F.R. § 404.1520(c).  Age, education, and work experience are not

8   considered at this step.  *Id.*

9       At Step Three, the Commissioner considers whether the claimant's impairment, or

10  impairments, "meets or equals" one of the Social Security Administration's compiled listings of

11  impairments that the Commissioner has established as disabling.  20 C.F.R. § 404.1520(a)(4)(iii).  If

12  the claimant's impairment meets one of these listed impairments, the Commissioner will find the

13  claimant disabled.  If the impairment does not meet one of the listed impairments, the process

14  continues to Step Four.

15      At Step Four, the Commissioner considers whether the claimant, in light of his residual

16  functional capacity ("RFC") as determined according to 20 C.F.R. § 416.945, can continue to

17  perform work he has performed in the past. 20 C.F.R. § 404.1520(a)(4)(iv).  The RFC represents

18  "the most [a claimant] can still do in light of [their] limitations."  20 C.F.R. § 416.945(a).  The RFC

19  is developed based on consideration of "all relevant evidence in [the] case record", including

20  medical history and reports, statements about the claimant's abilities from medical sources, and

21  "descriptions or observations of [claimant's] limitation . . . provided by [claimant], [claimant's]

22  family, friends, or other persons."  20 C.F.R. § 416.945(a)(3).  All symptoms, including pain, are

23  considered to "the extent to which [] symptoms can reasonably be accepted as consistent with the

24  objective medical evidence, and other evidence."  20 C.F.R. § 416.929.   If the RFC assessment

25  determines that the claimant can perform his past work, the Commissioner will find him not

26  disabled. 20 C.F.R. § 404.1520(f).  If the RFC assessment determines that the claimant cannot

27  perform his past work, then the claimant proceeds to Step Five of the evaluation.

28                                           11

At Step Five, the Commissioner considers the claimant's RFC, age, education, and work experience to determine whether the claimant can "make an adjustment to other work." 20 C.F.R. § 404.1520(a)(4)(v). If the claimant cannot make an adjustment to other work, the Commissioner will find him disabled. *Id.* At Step Five, the burden shifts to the Commissioner to show that the claimant, in light of his impairments, age, education, and work experience, can adjust to other work in the national economy, and that such a job actually exists. *Distasio v. Shalala*, 47 F.3d 348, 349 (9th Cir. 1995).

At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since August 2, 2005, the alleged onset date. AR at 10. Therefore, he continued to Step Two.

At Step Two, the ALJ found that the Claimant had the following severe impairments: degenerative disc disease of the lumbar spine with radiculopathy. *Id.*

At Step Three, the ALJ found that the Claimant did not have an impairment or combination of impairments that met or equaled a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at 11.

The ALJ found that Plaintiff had the following RFC:

> . . .the claimant has the residual functional capacity to lift/carry 10 pounds occasionally and less than 10 pounds frequently, stand/walk up to six hours in an eight-hour workday, and sit up to six hours in an eight-hour workday. The claimant can occasionally balance, stoop, kneel, crouch, crawl and climb stairs and ramps, but should never climb ropes, ladders or scaffolds. The claimant should avoid concentrated exposure to extreme cold, hazards of heights and hazards of machinery.

*Id.* at 11-12. In support of this conclusion, the ALJ relied on the conclusion of State Agency medical consultant Dr. Chitnis and on the opinion of Dr. Nolan, noting that "[w]hile not every limitation was accepted from the following sources, the undersigned based the claimant's residual functional capacity on components of these opinions that were consistent with the evidence as a whole." *Id.* at 15. The ALJ accepted the opinion of Dr. Chitnis that "claimant can stand and/or walk six hours in an eight-hour workday and also accepts some of the postural limitations." *Id.* However, the ALJ rejected Dr. Chitnis's opinion on how much weight Plaintiff could lift, and instead gave

12

"the claimant the benefit of the doubt," in finding that Plaintiff can lift only 10 pounds occasionally, and less than 10 pounds frequently. *Id.*

The ALJ also concurred with some limitations recognized by Dr. Nolan, including the limitations on movement and pounds Plaintiff is able to carry. *Id.* The ALJ disagreed with Dr. Nolan's conclusion that Plaintiff should be able to change position at will while working. *Id.*

At Step Four, the ALJ found that the Plaintiff is "unable to perform any past relevant work." *Id.* He further noted that "[t]he residual capacity for less than a full range of light work precludes the [Plaintiff] from performing his past relevant work." *Id.*

At Step Five, the ALJ found that "[c]onsidering the [Plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs in significant numbers in the national economy that the claimant can perform." *Id.* The ALJ based this finding on the testimony of the VE, which determined the "extent to which these limitations erode the unskilled light occupational base." *Id.* at 17. The finding noted that the VE testified that with the Plaintiff's age, education, work experience, and residual functional capacity, the Plaintiff could perform the requirements of various occupations, including "Office Helper" and "Transportation Material Mover." *Id.* The ALJ thus concluded that a "finding of 'not disabled' is appropriate." *Id.*

The final finding of the ALJ was that the Plaintiff "has not been under a disability, as defined in the Social Security Act, from August 2, 2005 through the date of this decision" and that the claimant is not disabled. *Id.*

### G.    Contentions of the Parties Regarding the ALJ's Findings

Plaintiff asserts that the ALJ erred in a number of respects and therefore, his decision should be reversed. Plaintiff argues that the ALJ erred in rejecting the opinion of Dr. Nolan, and that the ALJ did not provide specific legitimate reasons based on substantial evidence in the record for this rejection. Plaintiff's Motion at 10. Plaintiff also asserts that the ALJ improperly discounted the lay testimony of Plaintiff's girlfriend and roommate Dawn Rouanzoin. *Id.* at 16. Plaintiff further claims that the ALJ failed to consider the side effects of Plaintiff's medications as required by 20 CFR Section 1529(c)(3)(iv). *Id.* at 13. Finally, Plaintiff claims that the ALJ's reliance on the vocational

testimony is improper and that this testimony is without evidentiary value because the hypothetical limitations proposed by the ALJ at trial and used by the VE to recommend jobs do not fully describe the Plaintiff's limitations. *Id.* at 17. The Plaintiff further asks that the claim be remanded for payment of benefits. *Id.* at 21. Alternatively, Plaintiff requests remand for further proceedings for a "proper and fair determination of his claim." *Id.*

In its Cross-Motion, Defendant argues that the ALJ's decision is free of legal error and supported by substantial evidence. First, Defendant asserts that the ALJ's rejection of Dr. Nolan's opinion regarding the Plaintiff's limitation of changing position at will is supported by the medical record and is consistent with other medical opinions. Defendant's Cross-Motion at 12. Second, Defendant argues that the medical record does not offer competent evidence to support the Plaintiff's side effects testimony. *Id.* at 17. Third, Defendant argues that the ALJ properly rejected Ms. Rouanzoin's testimony, as it was unsupported by medical evidence and mirrors the properly-rejected testimony of the Plaintiff. *Id.* at 19-20. Fourth, Defendant asserts that the ALJ properly considered the VE's testimony in the ALJ's five-step finding because that testimony was in response to a complete hypothetical question supported by substantial evidence. *Id.* at 20-21. Defendant asks this Court to affirm the ALJ's decision, or, in the alternative, to remand for further proceedings.

## III. ANALYSIS

### A. Legal Standard

When reviewing the Commissioner's decision, the Court takes as conclusive any findings of the Commissioner which are free from legal error and "supported by substantial evidence." 42 U.S.C. § 405(g). Substantial evidence is "such evidence as a reasonable mind accepts as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence means "more than a mere scintilla" but "less that a preponderance." *Desrosiers v. Secretary of Health & Human Services*, 846 F.2d 573, 576 (9th Cir. 1988). Even if the Commissioner's findings are supported by substantial evidence, they should be set aside if proper legal standards were not applied when using the evidence to reach a decision. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978). In reviewing the record, the Court must consider both the evidence that supports and

United States District Court

For the Northern District of California

1    detracts from the Commissioner's conclusion.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir.

2    1996).

3         **B.      The ALJ's Treatment of Dr. Nolan's Opinion**

4         Plaintiff asserts that the ALJ's decision should be reversed because he did not offer adequate

5    reasons for partially rejecting the opinion of Dr. Nolan, a treating physician, as to Plaintiff's

6    limitations and employability.  Although the ALJ may consider many sources, the opinion of a

7    treating physician normally is given special weight.  *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.

8    1996).  "The ALJ may not reject the opinion of a treating physician, even if it is contradicted by the

9    opinions of other doctors, without providing 'specific and legitimate reasons' supported by

10   substantial evidence in the record."  *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001)

11   (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)).  The Court concludes that the ALJ

12   met this requirement for certain parts of his consideration of Dr. Nolan's opinion, but did not for

13   others.

14        Plaintiff asserts that the ALJ failed to include or otherwise dismiss some of Dr. Nolan's

15   limitations in his decision.  The excluded limitations pointed to by Plaintiff include "no repetitive

16   bending, no repetitive lifting, no repetitive carrying, no repetitive pushing, no repetitive pulling, no

17   repetitive twisting; the need to take narcotics and muscle relaxants medication to control pain during

18   work hours which would present a problem with cognitive abilities, and the need for an ergonomic

19   work station."  Plaintiff's Motion at 12.

20        Dr. Nolan's limitations on repetitive motions, as listed above, are adequately addressed by

21   the ALJ's finding of the limitation that Plaintiff can "occasionally[3] balance, stoop, kneel, crouch,

22   crawl and climb stairs and ramps," the limitation stating that "[Plaintiff] has the residual functional

---

24   [3]"Occasionally" is defined in Social Security Ruling (SSR) 96-9p as that work  "occurring from very

25   little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour
     workday."  SSR 96-9P, 1996 WL 374185 (S.S.A.) (July 2, 1996).   Though SSRs are binding upon
26   ALJs, they "do not have the force of law" in the district courts.  *Quang Van Han v. Bowen*, 882 F.2d
     1453, 1457, & n. 6 (9th Cir. 1989).  The Ninth Circuit gives them deference so long as they do not
27   produce "a result inconsistent with the statute and regulations." *Bunnell v. Sullivan*, 947 F.2d 341, 346
     n. 3 (9th Cir. 1991).

28                                                    15

United States District Court

For the Northern District of California

1    capacity to lift/carry 10 pounds occasionally and less than 10 pounds frequently," and by the

2    classification of work the Plaintiff can perform as "sedentary."[4]   Social Security Ruling 96-9p

3    specifically addresses limitations on pushing and pulling, noting that "the ability to push or pull will

4    generally have little effect on the unskilled sedentary occupational base."  SSR 96-9P, 1996 WL

5    374185 (S.S.A.) (July 2, 1996).  Thus, the ALJ properly addressed limitations on movement in his

6    finding.

7         The Plaintiff exaggerates Dr. Nolan's findings regarding the symptoms of Plaintiff's pain

8    medication.  Dr. Nolan's proposed limitations in his May 25, 2009 Medical Legal Report included

9    "the ability to take medications (narcotic and muscle relaxant) to control the pain during work

10   hours."  AR at 540-541.  He further states that "[a] return to work with narcotic medications always

11   presents a problem in that cognitive abilities can be impaired with this medication, and therefore

12   work opportunities are significantly restricted." *Id.* at 541.  However, Dr. Nolan did not state that the

13   Plaintiff is or "would" be impaired by the medication – only that he *may* be.  Dr. Nolan did not

14   address the side effects of Plaintiff's medication at any other point in Plaintiff's medical records; nor

15   did any other physician who treated Plaintiff.  Regarding Dr. Nolan's opinion on the side effects of

16   the medication, the ALJ gave proper treatment to a speculative opinion that was presented as such.

17   However, the ALJ's treatment of evidence pertaining to the medication side effects as a whole,

18   including the Plaintiff's and Ms. Rouanzoin's testimony on the matter, was improper.  This topic

19   will be discussed below.

20        The ALJ's treatment of the two remaining limitations suggested by Dr. Nolan was improper.

21   The only limitation suggested by Dr. Nolan that was dismissed directly by the ALJ was the

22   Plaintiff's need to change position at will.  AR at 15.   The ALJ explained in his findings that he

23   "relied on several opinions of record," that there were different views within these opinions on

24   Plaintiff's limitations, and that the ALJ "based the claimant's [RFC] on components of these

25   _____

26   [4]Sedentary work is defined in 20 C.F.R. § 404.1567(a) as work which: "involves lifting no more than
     10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small
27   tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking
     and standing is often necessary in carrying out job duties."

28
                                              16

United States District Court
For the Northern District of California

opinions that were consistent with the evidence as a whole." *Id.*  This is the only explanation in the ALJ's opinion as to why he rejected Dr. Nolan's limitation regarding the need to change position at will.  The ALJ's reason is not specific, as it does not pertain directly and specifically to the limitation, but instead pertains to the limitations as a whole in a conclusory manner.  *See O'Neal v. Astrue*, 391 Fed.Appx. 614, 618 note 3 (9th Cir. 2010) (noting that "[t]he ALJ also stated that the treating physicians' opinions were inconsistent with objective medical evidence. . . . The ALJ did not identify the particular 'objective medical evidence' to which he was referring, however.  '[C]onclusory reasons will not justify an ALJ's rejection of a medical opinion.'" (quoting *Regennitter v. Soc. Sec. Comm'r.*, 166 F.3d 1294, 1297 (9th Cir.1999)).  Similarly, the ALJ here did not refer to specific medical evidence to show that Dr. Nolan's limitation requiring movement at will was incorrect.  Furthermore, the Court is not persuaded that discrediting a treating doctor's opinion regarding a limitation because it is not supported by "the evidence as a whole," AR at 15, is specific and legitimate where the administrative record contains evidence supporting that opinion.  *See Hughes v. Commissioner of Social Sec. Admin.*, 403 Fed.Appx. 218, 220-21 (9th Cir. 2010) (finding that the ALJ erred in rejecting the treating physician's opinion "on the basis that it was too heavily based on Hughes's subjective complaints and not supported by other medical evidence," where the treating doctor explicitly separated his consideration of his patient's complaints and his clinical findings, and his opinion was supported by other medical evidence).  Not only does Ms. Rouanzoin's testimony offer support for Dr. Nolan's findings, Dr. Rosenberg's analysis of the patient found "pain with abduction against persistence in a sitting position." AR at 339.  Thus, the ALJ did not provide specific and legitimate reasons for the dismissal of Dr. Nolan's opinion regarding the Plaintiff's limitation of changing position at will.

The same is true for the ALJ's treatment of Dr. Nolan's limitation requiring an ergonomic work station.  This limitation is mentioned once by the ALJ in a list of proposed limitations that the ALJ purports to accept, but then is not included in the list of limitations comprising the Plaintiff's RFC.  *See id.* at 13, 15.  The limitation requiring an ergonomic work station was also not included in the ALJ's hypotheticals to the VE.  *Compare Schneider v. Com'r Social Sec. Admin.*, 2011 WL

1762569, *1-2 (9th Cir. May 10, 2011) (stating that an ALJ did not improperly consider the claimant's treating physician's testimony regarding a limitation, where that limitation was not discussed in the opinion but was included in a hypothetical to the VE at the administrative hearing). There is no reason given for its exclusion from the ALJ's findings in the Plaintiff's RFC, and it is not a recognized limitation. The language of the ALJ's opinion also seems to preclude that this limitation was meant to fall within those limitations that were not supported by the "evidence as a whole," given that the sentence describing Dr. Nolan's limitations is: "The [ALJ] finds most of these limitations to be appropriate at this time (with exception of the need to change position at will), especially when considering that ability to perform 'light' exertion also means an ability to perform 'sedentary' exertion." AR at 15-16. This limitation requiring an ergonomic work station was simply disregarded by the ALJ, who did not provide specific or legitimate reasons, or any reasons at all, for its exclusion from the Plaintiff's RFC analysis.

The importance of considering and addressing both these limitations is shown in the VE's testimony at the administrative hearing. When Plaintiff's attorney questioned the VE as to the need to move at will, the VE responded that if the frequency of movement was as high as every 10 to 15 minutes, the individual would not be employable. *Id.* at 53. Even if the movement were lessened, and required "unscheduled work interruptions of one half hour, four to five times per week," the VE found that the employee would still be unemployable. *Id.* 53-54. A similar response resulted from the limitation of an ergonomic work station — if the Plaintiff was employed in sedentary work, as the ALJ suggests is appropriate in his findings, the need to lean back in one's chair becomes a "significant vocational factor" that could limit employment due to inability to properly access the work space without modifications. *Id.* at 16, 54-55. The same would result if the Plaintiff was employed in "light" employment. *Id.* at 55.

The ALJ dismissed these opinions without following the correct legal standard regarding specific and legitimate reasons for dismissal. Thus, in accordance with *Benitez*, the ALJ's decisions on these matters should be set aside as legal error. *See Benitez*, 573 F.2d at 655.

United States District Court

For the Northern District of California

**C.**     **The ALJ's Treatment of Lay Testimony**

In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to work." *Stout v. Commissioner, Social Sec. Admin.*, 454 F.3d 1050, 1053 (9th Cir. 2006); s*ee also Dodrill v. Shalala,* 12 F.3d 915, 919 (9th Cir. 1993); 20 C.F.R. §§ 404.1513(d)(4) & (e), 416.913(d)(4) & (e).  This testimony cannot be discounted "unless [the ALJ] expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001) (quoting *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir.1996)).  Furthermore, "friends and family members in a position to observe a claimant's symptoms and daily activities are competent to testify as to [their] condition." *Dodrill v. Shalala*, 12 F.3d 915, 918-19 (9th Cir. 1993); *see also Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir.1987).  "Disregard of this evidence violates the Secretary's regulation that [the ALJ] will consider observations by non-medical sources as to how an impairment affects a claimant's ability to work." *Sprague*, 812 F.2d at 1232.  If the ALJ fails to "properly discuss competent lay testimony favorable to the claimant, a reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination." *Stout v. Commissioner*, 454 F.3d 1050, 1056 (9th Cir. 2006).

In his findings, the ALJ addresses Ms. Rouanzoin's testimony in one sentence: "Ms. Rovanzoin [sic] was less than credible or helpful as she merely reported what she has observed." AR at 14.  The ALJ's disregard of her testimony solely on the basis that it is based on "what she has observed" is not a reason germane to this particular witness.  First, this dismissal is not specific to this witness – there are no specific reasons, either through comparing her observations to the medical record or otherwise, given as to why Ms. Rouanzoin's observations are not credible or helpful.  *See Graham v. Commissioner of Social Sec.*, 2011 WL 2601558, *1 (9th Cir. July 1, 2011) (noting that an ALJ's failure to comment upon lay witness was error); *compare Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001) ("One reason for which an ALJ may discount lay testimony is that it conflicts with medical evidence" (quoting *Vincent ex rel. Vincent v. Heckler*, 739 F.2d 1393, 1395 (9th Cir .1984) (per curiam)).  Ms. Rouanzoin's testimony pertained not only to what Plaintiff stated

United States District Court

For the Northern District of California

1  his medical problems were, but also to what she observed first-hand regarding his actions.

2  *Compare Williamson v. Commissioner Of Social Security*, 2011 WL 2421147, *1 (9th Cir. June 17,

3  2011) (noting that a recognition that most of the lay witness's opinion was based on the claimant's

4  subjective complaints was a germane reason for rejecting that lay witness testimony).  Furthermore,

5  lay testimony is necessarily based on observation – there is no other form of lay witness testimony

6  other than what a lay witness has observed.  *See Dodrill*, 12 F.3d at 918-19; *Sprague*, 812 F.2d at

7  1232.

8         The cases cited by Defendant are not persuasive.  In *Tidwell v. Apfel*, the Ninth Circuit

9  upheld an ALJ's rejection of the claimant's daughter's testimony because it was "based solely upon

10  her observations of Appellant's facial expressions, the manner in which Appellant walked, and the

11  fact that she had dropped objects."  *Tidwell v. Apfel*, 161 F.3d 599, 602 (9th Cir. 1998).  However,

12  the finding regarding the daughter's testimony was limited in that the testimony at issue only

13  pertained to: 1) actions that may not have related to the potential limitation of the claimant, 2) did

14  not establish a limitation at all, and 3) did not support the plaintiff's contention that the condition

15  existed during the relevant time period.  *See id.*

16        In the present case, Ms. Rouanzoin's testimony pertains directly to actions related to the

17  Plaintiff's limitations, including the Plaintiff's ability to focus and concentrate, walk, sit, and stand,

18  and on how often during the day the Plaintiff must recline.  *Id.* at 47-48.   Furthermore, the

19  testimony helped establish that certain limitations may exist, and the testimony pertained to the time

20  period at issue.  *Tidwell* does not provide support for the Defendant's argument.  Thus, the ALJ's

21  dismissal of Ms. Rouanzoin's testimony because it was based solely on her observations is

22  improper.

23        Finally, the Court concludes ALJ's dismissal of Ms. Rouanzoin's testimony does not

24  constitute harmless error.  Ms. Rouanzoin's testimony pertains directly to specific limitations on the

25  Plaintiff's abilities, including his ability to concentrate, focus, walk, sit, and stand.  For this reason,

26  Ms. Rouanzoin's testimony has direct bearing on the limitations included in the Plaintiff's RFC.

27  When the VE was prompted with additional limitations that are supported by Ms. Rouanzoin's

28

United States District Court

For the Northern District of California

testimony, the Plaintiff's employability was strictly decreased, in some situations to the point of unemployability. *See* AR at 47-48, 53-54 (Ms. Rouanzoin testified that she observed pain and inability to focus daily, that Plaintiff intermittently reclines throughout the day, and that Plaintiff "constantly [has] to switch positions" and has difficulty sitting. The VE notes that the need to move around every 10 to 15 minutes, the need to take unscheduled breaks of one half hour four to five times a week, and difficulty concentrating for a minimum of two hours per day would render Plaintiff unemployable, and that the inability to sit forward for more than a few minutes would be a "significant vocational factor"). Thus, if Ms. Rouanzoin's testimony is credited, a reasonable ALJ could make a significantly different finding on Plaintiff's limitations and ultimate disability determination. *See Stout*, 454 F.3d at 1056 (". . we hold that where the ALJ's error lies in a failure to properly discuss competent lay testimony favorable to the claimant, a reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination.") Thus, in accordance with *Stout*, the ALJ's disregard for Ms. Rouanzoin's testimony cannot be considered harmless error, and constitutes legal error due to a failure to follow proper legal standards in accordance with *Benitez*. *Benitez*, 573 F.2d at 655; *Stout*, 454 F.3d at 1056.

**D.      The ALJ's Consideration of the Cognitive Side Effects of Plaintiff's Medication**

Plaintiff asserts that the side effects of his medication impeded his concentration and present a limitation on cognitive abilities in the workplace. Plaintiff further claims that the ALJ improperly disregarded the side effects of the medication that Plaintiff was prescribed, which were supported by the medical record and testimony at the hearing. The Court disagrees as to the weight of the medical record on this matter, but agrees that the ALJ improperly disregarded certain testimony as to the side effects of Plaintiff's medication.

The ALJ considers the "type, dosage, effectiveness, and side effects of any medication [claimant] take[s] or ha[s] taken to alleviate [their] pain or other symptoms" as a factor relevant to its assessment of the claimant's alleged symptom-based limitations. 20 CFR § 404.1529(c)(3)(iv). 20 C.F.R. Section 404.1529 provides further that:

> Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions which you, your treating or nontreating source, or other persons report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . in reaching a conclusion as to whether you are disabled.

20 CFR § 404.1529(c)(3). Aside from the objective medical record, the claimant's testimony or other supportive testimony is important to the determination of limitations imposed by the side effects of medication. *See Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 585 (9th Cir. 1988) (superceded by statute on other grounds) (noting that "side effects can be a 'highly idiosyncratic phenomenon' and a claimant's testimony as to their limiting effects should not be trivialized" (quoting *Howard v. Heckler*, 782 F.2d 1484, 1488 (9th Cir. 1986)). If the ALJ chooses to disregard such testimony, he must "provid[e] a specific, clear and convincing reason, supported by the record, that [his] testimony was generally not credible." *Thomas v. Barnhart*, 278 F.3d 947, 960 (9th Cir. 2002). "So long as the adjudicator makes specific findings that are supported by the record, the adjudicator may discredit the claimant's allegations based on inconsistencies in the testimony or on relevant character evidence." *Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991).

As noted above, there is little evidence in the objective medical record describing the side effects of Plaintiff's medications. Aside from Dr. Nolan's recognition that the medications may cause cognitive impairment, the only direct evidence in the record as to the medications' side effects is found in Plaintiff's and Ms. Rouanzoin's testimony. Because Dr. Nolan's comment is speculative and not supported by other objective medical evidence in the record, the testimony of Plaintiff and Ms. Rouanzoin is the primary evidence in the record regarding any limitation from the side effects of medication.

The ALJ first addressed Plaintiff's testimony, finding it "not fully credible with regard to his assertion that he is unable to concentrate sufficiently to make change. This is unrealistic and not consistent with the medical evidence." AR at 14. The ALJ's reasons for discrediting Plaintiff's testimony are specific and supported by the medical record. The ALJ has reason from the medical

United States District Court

For the Northern District of California

1    record to find Plaintiff's assertions not credible.  First, Plaintiff's psychological testing during the

2    pain battery test (noted in Dr. Chitnis's August 23, 2007 report), showed  "evidence of exaggerated

3    pain behavior" and "that psychological factors were affecting his pain behavior and will interfere

4    with response to traditional medical treatment."  *Id.* at 359.  Thus, there is evidence in the medical

5    record that Plaintiff may exaggerate regarding his symptoms, and such evidence provides a credible,

6    evidentiary basis for the ALJ's decision not to credit Plaintiff's testimony regarding his symptoms.

7    *See Williamson v. Commissioner Of Social Security*, 2011 WL 2421147, *1 (9th Cir. June 17, 2011)

8    (noting that the ALJ properly discredited claimant's testimony regarding symptoms where one of

9    claimant's doctors found reason to suspect that claimant was exaggerating her symptoms).  The lack

10   of earlier complaints to any of the Plaintiff's physicians regarding side effects of medication also

11   indicates that the ALJ could properly infer that Plaintiff's testimony was not credible.  The ALJ's

12   dismissal of Plaintiff's testimony on this matter was within his discretion and was proper.

13          In the ALJ's findings, he addressed all of Ms. Rouanzoin's testimony, which included

14   testimony regarding possible cognitive impairment due to medication side effects, in one sentence:

15   "The testimony of Ms. Rovanzoin [sic] was less than credible or helpful as she merely reported what

16   she has observed."  AR at 14.  As noted above, the ALJ's dismissal of Ms. Rouanzoin's testimony

17   on these grounds was improper and not in line with the proper legal standard for lay testimony.

18   Thus, the ALJ's disregard for Ms. Rouanzoin's lay testimony regarding the side effects of Plaintiff's

19   medication was similarly improper.  *See Benitez*, 573 F.2d at 655; *Stout*, 454 F.3d at 1056.

20          **E.       The ALJ's Hypotheticals to the VE Regarding Plaintiff's Limitations**

21          The Plaintiff asserts that the hypotheticals propounded by the ALJ to the VE during the VE's

22   testimony did not adequately describe the Plaintiff's limitations, thereby rendering the vocational

23   testimony valueless.  The Court agrees.

24          If a vocational expert's hypothetical does not reflect all the claimant's limitations, then the

25   "expert's testimony has no evidentiary value to support a finding that the claimant can perform jobs

26   in the national economy."  *Matthews v. Shalala*, 10 F.3d 678, 681 (9th Cir. 1993) (quoting *DeLorme

27   v. Sullivan*, 924 F.2d 841, 850 (9th Cir. 1991)); s*ee also Desrosiers v. Secretary of Health and*

28                                                     23

*Human Services*, 846 F.2d 573, 578 (9th Cir. 1988) (Pregerson, J., concurring) ("The ALJ's depiction of the claimant's disability must be accurate, detailed, and supported by the medical record.").

As noted above in Section B, the ALJ failed to explain his rejection of two limitations that materially change the employability of Plaintiff if they are included in the hypotheticals (the limitation on moving at will and the limitation requiring an ergonomic workstation). The failure to include these limitations, or an explanation for their rejection, provides an incomplete picture of the Plaintiff's possible employability. Therefore, the vocational expert's hypothetical cannot reflect all of Plaintiff's limitations, and thus does not provide an adequate assessment of the Plaintiff's employability in the local or national economy. *See Matthews*,10 F.3d at 681. The testimony of the VE is not adequate and is without evidentiary value. *See id.*

### F.   Remedy

Having determined that the ALJ has erred, the Court must address whether to remand for further administrative proceedings or simply remand for award of benefits. Where the ALJ has failed to provide adequate reasons for rejecting lay testimony or a treating or examining physician's opinion, the Court "credit[s] that opinion as a 'matter of law.'" *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995) (quoting *Hammock v. Bowen*, 879 F.2d 498, 502 (9th Cir.1989)); *see also Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1996) (remanding for payment of benefits where Secretary did not provide adequate reasons for disregarding examining physician's opinion). If the credited testimony or opinion establishes that a finding of disability by the ALJ is clearly required by the record, remand for benefits is proper.

Here, therefore, the Court credits Dr. Nolan's opinion regarding the limitation on moving at will and the limitation requiring an ergonomic workstation on the Plaintiff, and the lay testimony of Ms. Rouanzoin. Taking this credited testimony and opinion into consideration alongside the testimony of the VE, the Court finds Plaintiff has demonstrated that he is disabled on the basis of his back condition and that the record is fully developed on this issue. In particular, the vocational expert specifically addressed the limitations contained in Dr. Nolan's opinion, including the need to

24

move at will, the need for an ergonomic work station, and testified that there would be no jobs Plaintiff could perform if he were required to alternate positions every 10 to 15 minutes, and that his options would be severely limited in the sedentary work range if he needed an ergonomic work station.  On this basis, the Court remands for award of benefits pursuant to § 405(g), sentence four.

## IV.    CONCLUSION

This case is REMANDED to the Commissioner of Social Security for award of SSI benefits as of August 2, 2005.

IT IS SO ORDERED.

Dated:  October 7, 2011

_____
JOSEPH C. SPERO
United States Magistrate Judge